IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MICHAEL C. SLOVER,

        Plaintiff,                        No. CV-10-258-HZ

    v.

COMMISSIONER, SOCIAL SECURITY                OPINION & ORDER
ADMINISTRATION,

        Defendant.

Kimberly K. Tucker
SWANSON, THOMAS & COON
820 S.W. Second Avenue, Suite 200
Portland, Oregon 97204

    Attorney for Plaintiff

Dwight Holton
UNITED STATES ATTORNEY
District of Oregon

1 - OPINION & ORDER

Adrian L. Brown
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

David Morado
REGIONAL CHIEF COUNSEL
L. Jamala Edwards
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Social Security Administration
Office of the General Counsel
701 5th Avenue, Suite 2900, M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Michael Slover brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1382(c)(3)). I reverse the Commissioner's decision and remand the case for an award of benefits.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB and SSI on December 11, 2005, Tr. 120-25, 117-19, alleging an onset date of February 15, 2001. Tr. 117, 120. His application was denied initially and on reconsideration. Tr. 58-61.

     On October 22, 2008, plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 24-45. The record was left open for receipt of additional evidence and a supplemental hearing was held on March 30, 2009, to take the testimony of a vocational expert (VE). Tr. 43-45, 457. On April 24, 2009, the ALJ found plaintiff not disabled. Tr. 13-23. The Appeals Council denied review. Tr. 1-3.

2 - OPINION & ORDER

FACTUAL BACKGROUND

Plaintiff alleges disability based on post-traumatic stress disorder (PTSD), and mood disorders, including bipolar disorder and schizoaffective disorder.[1]  Tr. 32, 142.  At the time of the first hearing, he was thirty-six years old.  Tr. 120.  Plaintiff obtained a GED in 1988, and has past relevant work experience as a telemarketer, bartender, clerk, railroad gate inspector, lubrication technician, and janitor.  Tr. 21, Tr. 148.  Because the parties are familiar with the medical and other evidence of record, I refer to additional relevant facts necessary to my decision in the discussion section below.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure.  See Valentine v. Commissioner, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of

---

[1]  As explained in the Diagnostic & Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV-TR), while distinguishing this disorder from true schizophrenia is difficult, it is its own recognized disorder.  DSM-IV-TR at 319-23.

3 - OPINION & ORDER

impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the

claimant is not disabled.

   In step three, the Commissioner determines whether the impairment meets or equals "one

of a number of listed impairments that the [Commissioner] acknowledges are so severe as to

preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d),

416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner

proceeds to step four. Yuckert, 482 U.S. at 141.

   In step four, the Commissioner determines whether the claimant, despite any

impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20

C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the

claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five,

the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at

141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his

burden and proves that the claimant is able to perform other work which exists in the national

economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

   At step one, the ALJ determined that plaintiff had not engaged in substantial gainful

activity since his alleged onset date. Tr.15. Next, at step two, the ALJ determined that plaintiff

had severe impairments of depression, PTSD, and polysubstance dependence in claimed

remission. Tr. 15. At step three, the ALJ determined that plaintiff's impairments did not meet or

equal, either singly or in combination, a listed impairment. Tr. 16-17.

   The ALJ next determined that plaintiff had the RFC to perform a full range of work at all

exertional levels, but with nonexertional limitations of simple, routine repetitive work, working alone and not as part of a team, avoiding any contact with the public, and avoiding exposure to severe workplace hazards.  Tr. 17-18.  In arriving at this RFC, the ALJ discussed the medical evidence and plaintiff's testimony.  As explained in more detail below, the ALJ found plaintiff's subjective symptom testimony not credible, and he rejected medical opinions offered by a treating nurse practitioner and a non-examining psychiatrist.  Tr. 17-20.

At step four, the ALJ, relying on his RFC, concluded that plaintiff could perform his past relevant work as a janitor.  Tr. 20-21.  The ALJ continued to step five, however, and relying on the testimony of the VE, concluded that even if plaintiff could not perform his past relevant work, he could perform other jobs existing in significant numbers in the national economy, including working as an industrial cleaner or laundry worker.  Tr. 21.  Finally, the ALJ concluded that plaintiff's medically-determinable substance abuse disorder was not a contributing material factor to the determination of disability.  Id.  Accordingly, the ALJ concluded that plaintiff was not disabled.  Tr. 22.

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d

1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  <u>Vasquez</u>, 572 F.3d at 591 (internal quotation and brackets omitted); <u>see also</u> <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation omitted).

DISCUSSION

Plaintiff alleges that the ALJ made several errors:  (1) improperly rejected plaintiff's testimony, (2) improperly rejected medical opinion evidence, (3) improperly rejected lay witness evidence, (4) improperly assessed the existence and effects of substance abuse, and (5) made unsupportable conclusions at steps four and five.

## I.  Plaintiff's Testimony

### A.  Plaintiff's Hearing Testimony

Plaintiff testified that he has PTSD, bipolar disorder, and schizoaffective disorder which make him confused.  Tr. 32.  He experiences hallucinations a couple of times each day.  <u>Id.</u>  He also experiences auditory hallucinations, less frequently than in the past, but still occasionally.  Tr. 36-37.  Being around a lot of people triggers these episodes.  Tr. 37.  Plaintiff also suffers from depression, making him feel hopeless and suicidal.  Tr. 36.  He experiences serious depressive episodes about every other month, each lasting a week.  <u>Id.</u>  During these episodes, he is unable to function normally, meaning he has no energy or motivation to do anything, he lets his hygiene go, and has problems making appointments.  <u>Id.</u>  He also experiences anxiety.  Tr.

38. He used to take lorazepam[2] to treat it, which made him more relaxed, but he stopped taking the medication about one month before the October 2008 hearing because of issues with sleep apnea. Tr. 38-39. At the time of the hearing, plaintiff's anxiety-related symptoms included feeling like he cannot breath and feeling as if something is crushing his chest, which he said he experiences a couple of times each day, for about one minute each time. Id. During these episodes, he has to "take time out" to get his feelings under control. Tr. 39-40.

Although no longer taking the lorazepam at the time of the hearing, plaintiff was on other medications for his mental health which he testified caused chronic diarrhea and required him to stay near a restroom. Tr. 40. He also described having problems with his memory. Tr. 41. He is unable to remember most of a thirty-minute television show after watching it, and forgets appointments, including medical appointments. Id. The clinic where he receives treatment telephones him before appointments with a reminder. Id. He also forgets what he is reading after a few sentences. Id. He limits his reading to comic books because they do not tax his memory. Tr. 41-42. He experiences symptoms even when taking his mental health medications. Tr. 40.

At the time of the hearing, plaintiff lived in a shed on his mother's property and saw her daily. Tr. 42. He goes grocery shopping about once per month and his mother helps him with cooking. Id.

Plaintiff discussed his drug and alcohol use. He stated that the last time he used methamphetamine or marijuana was before he went to prison in 2004. Tr. 30. Plaintiff served a

---

[2] Lorazepam is used to treat anxiety. See National Institutes of Health website at: http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/

fifteen-month sentence for assaulting his wife, which he said occurred during a blackout.  Tr. 35.

He was off medication at the time, and indicated that when he takes his mental health

medications, he feels better and thinks he does not need them anymore, so he will sometimes

stop taking them.  Id.  The assault occurred during one of those times.  Id.  In prison, he received

"dual diagnosis" treatment.  Tr. 31.  The ALJ noted that the medical records suggested that

plaintiff had had one relapse of methamphetamine use since his discharge from prison.  Tr. 32.

Plaintiff did not recall the incident, but he did not contradict the ALJ and he affirmed that it was

a "one time thing."  Id.

Plaintiff also testified that he used alcohol rarely and does not "drink to get drunk"

anymore.  Tr. 31.  The last time he had had alcohol was a few days before the hearing when he

drank three beers as part of a birthday celebration for a friend.  Id.  The previous time he used

alcohol was a few months earlier.  Id.  Since he stopped doing drugs, plaintiff has better control

over his temper.  Tr. 41.

B.  The ALJ's Decision re: Plaintiff's Credibility

The ALJ concluded that while plaintiff has an underlying medical condition that could

reasonably result in the alleged symptoms if plaintiff failed to follow his medical regimen or

attempted to exceed what the ALJ determined to be his RFC, his allegations about the intensity,

persistence, and limiting effects of his symptoms were "disproportionate and not supported by

the objective medical findings or by any other corroborating evidence."  Tr. 18.  The ALJ noted

that the treatment plaintiff received was routine and conservative in nature, as well as successful

in controlling his symptoms, that his daily activities were inconsistent with his testimony, and

that the record included doctors' statements suggesting he had exaggerated his symptoms and

limitations and was engaging in possible malingering or misrepresentation.  Id.  The ALJ also

noted that plaintiff had made inconsistent statements about his past drug use, and while that

might not have been the result of a "conscious intention to mislead," it still suggested that the

information provided by plaintiff concerning his symptoms generally may not be entirely

reliable.  Id.  He stated that plaintiff's criminal record and inconsistent reporting of his substance

abuse adversely affected his credibility.  Tr. 20.

    C.  Discussion

    Plaintiff argues that the ALJ erred in rejecting plaintiff's testimony.  I agree with plaintiff.


    The ALJ is responsible for determining credibility.  Vasquez, 572 F.3d at 591.  Once a

claimant shows an underlying impairment and a causal relationship between the impairment and

some level of symptoms, clear and convincing reasons are needed to reject a claimant's

testimony if there is no evidence of malingering.[3]  Carmickle v. Commissioner, 533 F.3d 1155,

1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the

record includes objective medical evidence establishing that the claimant suffers from an

impairment that could reasonably produce the symptoms of which he complains, an adverse

credibility finding must be based on 'clear and convincing reasons'").

    First, while the ALJ conceded that plaintiff's receipt of treatment for his symptoms would

normally weigh in his favor, the ALJ nonetheless used the treatment to negate plaintiff's

testimony because, the ALJ found, the treatment was routine and conservative in nature and

---

[3]  While the ALJ indicated that there was evidence suggesting exaggeration or perhaps
malingering or misrepresentation, he still employed this analysis.

successful in controlling his symptoms.  The fact that treatment may be routine or conservative is not a basis for finding subjective symptom testimony unreliable absent discussion of the additional, more aggressive treatment options the ALJ believes are available.  See Lapeirre-Gutt v. Astrue, 382 Fed. Appx. 662, 662 (9th Cir. 2010) (ALJ erred in relying on "conservative treatment" basis for rejecting plaintiff's testimony when "the record does not reflect that more aggressive treatment options are appropriate or available"; noting that a "claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.").

The administrative record shows that plaintiff's treatment included regular visits to various providers over the years (Cascadia, Umatilla County Mental Health, Westside Clinic, as well as emergency room mental health-related visits and treatment while in ODOC custody). This longitudinal record suggests that plaintiff's symptoms were longstanding and ongoing.  The fact that it was "routine" or regular does not reasonably weigh against a claimant.  The ALJ's statement that the treatment was "conservative" is without any reference to what type of treatment the ALJ expected plaintiff to obtain.  The record clearly shows his lack of insurance and ability to afford anything other than what was available via the County or other public health services.  The record also shows that his symptoms were treated with medication, which frequently changed in type and/or dose, and thus, he received dynamic, responsive treatment as opposed to "conservative" treatment.  Additionally, while there were times when plaintiff's symptoms were controlled and his symptoms stabilized, such periodic relief of symptoms is not inconsistent with disability, Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1996), and in plaintiff's case, such stability occasionally tempted plaintiff to stop taking his medications, causing his symptoms to increase.  Moreover, as discussed more fully below, Psychiatric Mental Health

Nurse Practitioner (NP) Susan Marie expressly stated that plaintiff suffered from various symptoms despite being compliant with treatment.

Second, the ALJ faulted plaintiff for missing appointments and failing to comply with his medical regimen.  But, NP Marie noted that plaintiff had been compliant with treatment and had kept more than eighty percent of his appointments in the prior year.  And, the record suggests that his failure to keep his appointments is a symptom of his mental impairments.  Tr. 593 (NP Marie noting plaintiff's problems with keeping appointments when he stops taking medication); Tr. 153 (plaintiff's mother's statement that part of plaintiff's disability was needing to be reminded to keep his appointments).  As the Ninth Circuit noted in a 1996 case, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation[]" and psychiatric treatment.  Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (internal quotation omitted).

Third, the ALJ found plaintiff's testimony of the severity of his symptoms to be inconsistent with plaintiff's activities of daily living.  The ALJ found that plaintiff cared for himself without assistance, prepared simple daily meals, performed normal household chores when he lived in transitional housing, walked, used public transit, shopped in stores three times per month, used a computer, watched television, created art, played a guitar, went fishing, and socialized with friends and relatives.  Tr. 18.  In support, the ALJ cited the written disability reports submitted by plaintiff and his mother.  Id. (citing Exhibits 5E and 6E).

Plaintiff's mother's report, described more fully below, does not support the ALJ's finding because she indicates that she takes plaintiff grocery shopping and that the socializing he does with friends and family consists of visiting her and phone calls with a friend who lives in

Kansas.  Tr. 151, 155.  In his own report, plaintiff states that he sometimes forgets to bathe and

shave, that he prepares only microwave food, hot dogs, and sandwiches, that while he can

perform household chores such as vacuuming and cleaning the bathroom in his transitional

housing situation, he needs reminders to do so, that he uses public transit, that he forgets to pay

bills, and that while he enjoys art, guitar, and fishing, he goes fishing less because it requires him

to go outside.  Tr. 159-66.  He also indicated that he avoids interactions with people by wearing

headphones and dark sunglasses, that he cannot stay focused enough to follow detailed

instructions, and that his mind wanders and he loses track of what is going on.  Id.

The ALJ's description of plaintiff's activities is not consistent with the evidence he cites.

Rather, it appears that the ALJ relied on selective portions of the written statements without

noting the complete information contained in them.  Taking evidence out of context to find

plaintiff not credible was error.  See Reddick v. Chater, 157 F.3d 715, 722-23 (9th Cir. 1998)

(noting that "disability claimants should not be penalized for attempting to lead normal lives in

the face of their limitations" and finding that the ALJ's  "paraphrasing of record material is not

entirely accurate regarding the content or tone of the record"); see also Vertigan v. Halter, 260

F.3d 1044, 1050 (9th Cir. 2001) ("mere fact that a plaintiff has carried on certain daily activities .

. . does not in any way detract from her credibility as to her overall disability.  One does not need

to be 'utterly incapacitated' in order to be disabled").

Fourth, the ALJ stated that the record included "statements by doctors suggesting the

claimant has exaggerated symptoms and limitations and was engaging in possible malingering or

misrepresentation."  Tr.18.  The ALJ fails to cite any specific evidence in the record supporting

this statement.  In my review of the record, the only evidence of this nature is the comment by

consultative examining psychologist Gary Sacks, Ph.D., that plaintiff's responses to the

Minnesota Multiphasic Personality Inventory II (MMPI-II) test resulted in an elevated profile

which indicated "extreme over-reporting and exaggeration of symptomatology." Tr. 605. While

Dr. Sacks acknowledged that plaintiff may be experiencing significant distress, Dr. Sacks stated

that plaintiff's motivation for responding in the manner he did might "be hypothesized as an

effort to emphasize distress." Id.

The ALJ failed to note that Dr. Sacks himself indicated that his report was based on a

"brief evaluation," that information was analyzed without corroboration, "and opinions formed

as a result of this consultation should be viewed in that light." Tr. 599. Notably, Dr. Sacks did

not expressly state that plaintiff was malingering, which is a specific diagnosis delineated in the

DSM-IV-TR, and which requires "the intentional production of false or grossly exaggerated

physical or psychological symptoms, motivated by external incentives[.]" DSM-IV-TR at 739.

In contrast to Dr. Sacks's comments, NP Marie expressly stated that there was no reason

to believe that plaintiff was malingering or exaggerating his symptoms. No other medical

records support the ALJ's finding.

The ALJ exaggerated the record when he referred to doctors in the plural, and when he

suggested that there had been an express reference by doctors to plaintiff's malingering or

misrepresentation. There is only one consultative psychologist who indicated that plaintiff's

responses to one test might show an effort to emphasize distress. This single observation stands

in contrast to the numerous other medical records, from treatment providers with various

agencies, including the ODOC, who make no suggestion or finding that plaintiff exaggerated his

symptoms or was malingering. As a result, while a tendency to exaggerate symptoms may be a

13 - OPINION & ORDER

legitimate consideration in determining credibility, <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001), the ALJ's finding in this case is not supported in the overall record.

Fifth, the ALJ stated that plaintiff made inconsistent statements about his past drug use, Tr. 18, 20, and was also not credible because of his criminal record. Tr. 20. The ALJ failed to cite to specific parts of the record in support of his finding that plaintiff made inconsistent statements regarding his substance abuse. At the hearing before the ALJ, plaintiff stated that he had not used marijuana or methamphetamine since his incarceration in 2004, and that he used alcohol only occasionally. Tr. 30, 31. When the ALJ stated that the record indicated that plaintiff had had one methamphetamine relapse since his release from prison, plaintiff did not contradict the ALJ, but explained that he did not recall the incident and indicated that if he did use, it was a "one time thing." Tr. 31-32. Other than this, the basis for the ALJ's statement that plaintiff has made inconsistent statements regarding his substance abuse is unclear. In fact, since his release from prison in 2005, there appear to be no records containing affirmative evidence of ongoing substance abuse. The only record is the single relapse episode referred to by the ALJ, which occurred in May 2006. Tr. 449. Without an explanation, the ALJ's reference to plaintiff's alleged inconsistent statements regarding his substance abuse is not supported by substantial evidence in the record.[4]

Finally, as to the criminal history, the ALJ fails to explain why the fact of plaintiff's two prior convictions renders his subjective testimony regarding his symptoms not credible in this

---

[4] Although not cited by the ALJ, Dr. Sacks found that plaintiff's report to him concerning his substance abuse was inconsistent with his report to other providers. As discussed below, the record does not support Dr. Sacks's finding in this regard and thus, to the extent the ALJ relied on it, it was error.

14 - OPINION & ORDER

case.  Although Federal Rule of Evidence 609 is not controlling in the administrative setting,

Bayliss v. Barnhart, 427 F.3d 1211, 1218 n.4 (9th Cir. 2005) (Federal Rules of Evidence do not

apply to the admission of evidence in social security administrative proceedings), it is

instructive.  See Hardisty v. Astrue, No. CV-06-1670-BR, Opinion at pp. 11-12 (D. Or. Nov. 29,

2009) (analyzing, by reference to Rule 609, whether ALJ erred in considering plaintiff's past

convictions in determining credibility).

Rule 609(a)(2) provides "evidence that any witness has been convicted of a crime shall

be admitted regardless of the punishment, if it readily can be determined that establishing the

elements of the crime required proof or admission of an act of dishonesty or false statement by

the witness." Fed. R. Evid. 609(a)(2).

Rule 609(b) provides that:

[e]vidence of a conviction under this rule is not admissible if a period of more
than ten years has elapsed since the date of the conviction . . . unless the court
determines, in the interests of justice, that the probative value of the conviction
supported by specific facts and circumstances substantially outweighs its
prejudicial effect.

Fed. R. Evid. 609(b).

Plaintiff testified that he spent time in prison in 1994 for a robbery conviction.  Tr. 34.

Because this conviction was more than ten years old at the time of the hearing, and did not

involve an act of dishonesty or false statement, the ALJ's reliance on it without discussing its

probative value and relationship to plaintiff's credibility, is not a clear and convincing reason for

rejecting plaintiff's testimony.  See Hardisty, Op. at p. 12 (plaintiff's remote criminal history

which involved no act of dishonesty or false statement was not a clear and convincing reason to

reject plaintiff's testimony).

15 - OPINION & ORDER

Plaintiff's 2004 conviction for assaulting his then-wife would be admissible under Rule 609. However, there is no dispute in the record that plaintiff was off his mental health medication at the time this occurred and that it occurred during a blackout. Additionally, plaintiff testified that since he stopped doing drugs, his temper has been better controlled. Given these circumstances, the ALJ should have offered an explanation for why the fact of this conviction alone suggested that plaintiff's testimony was not credible. Without an explanation, the fact of conviction alone is not a clear and convincing reason to reject plaintiff's testimony.

II.  Medical and Medical Opinion Evidence

A.  Evidence in the Record

Plaintiff does not dispute the ALJ's findings regarding his physical exertional capabilities. Thus, only the mental health evidence is relevant to the issues raised here.

Plaintiff's mental health treatment records begin in 2001, when he received treatment at Cascadia Behavioral Healthcare (formerly Network Behavioral Healthcare, Inc.). In June 2001, he presented with "numerous concerns," mostly related to anger and grief over his father's death six months earlier. Tr. 294. He indicated his anger was scaring him, and a "rule out" diagnosis of PTSD, based on a prior stabbing incident, was assessed. Tr. 243, 298. In December 2001, he reported feeling helpless and hopeless and was assessed by Cascadia as having depressive

disorder NOS.[5]  Tr. 303.  As of January 2002, he was taking Prozac[6] and trazadone[7] to address

his mental health symptoms, which appeared to stabilize and improve.  Tr. 306, 311.

      Plaintiff moved to Pendleton in 2002 where Umatilla County Mental Health continued

plaintiff's diagnosis as PTSD, enrolled him in a support group, and apparently continued his

medications.  Tr. 256-57.  During 2002, plaintiff met several times with a mental health therapist

at Umatilla County Mental Health.  Tr. 215-91.  He also missed several appointments,

sometimes without explanation and sometimes because of circumstances such as the lack of a

car, a death in the family, and unspecified "family concerns."  Tr. 260, 268, 272, 278, 280, 289,

290.  He moved back to the Portland area in January 2003.  Tr. 293.

      On January 15, 2003, plaintiff appeared at Cascadia's walk-in clinic requesting refills of

his medications, which he identified as trazadone, Prozac, and Depakote[8].  Tr. 293.  He noted

that his depression was manageable, but at times he was having trouble with overwhelming

anxiety.  Id.

      On July 2, 2003, plaintiff attempted to kill himself by overdosing on various medications.

Tr. 333-35, 337.  After telling his mother what he had done, he was taken to the hospital by

ambulance and admitted as a patient.  Id.  He denied having auditory or visual hallucinations,

---

[5]  The "NOS" in mental health diagnoses refers to "not otherwise specified,'"indicating
that the patient has features of the disorder, but they do not meet the precise diagnostic criteria.
See, e.g., DSM-IV-TR at 381 (describing depressive disorder NOS).

[6]  Prozac is used to treat depression and panic attacks.  See
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/

[7]  Trazadone is used to treat depression, but also sometimes used to treat insomnia,
schizophrenia, and anxiety.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/

[8]  Depakote is used to treat mania in people with bipolar disorder.  See
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/

and no other psychotic symptoms were noted.  Id.  He was diagnosed with adjustment disorder, and PTSD by his reported history.  Id.  His Global Assessment of Functioning (GAF) score was 20-30.[9]  Id.

On August 16, 2003, plaintiff was admitted to Adventist Medical Center due to suicidal ideation.  Tr. 318-19.  The admission narrative indicates that following the July 2, 2003 episode, plaintiff stabilized on medications prescribed by Cascadia staff, including Depakote, Prozac, and trazadone, for recurring depression and PTSD.  Tr. 319.  As he began to feel better, however, he discontinued his medications.  Id.  He lost a job and learned that his wife was leaving him.  Id.  He denied hallucinations, illusions, or delusions.  Tr. 332.  He was assessed with major depression, recurrent, without psychotic features, and PTSD.  Id.  His GAF at that time was 35, with a previous GAF of 55[10].  Id.

In October 2004, plaintiff went to prison until September 2005, for an assault on his wife which he states he does not remember because it occurred during a "blackout."  Tr. 35.  The records from his care while incarcerated with the Oregon Department of Corrections  (ODOC), show that upon entry, he was still taking Prozac, trazadone, and Depakote.  Tr. 406.  His initial mental health evaluation resulted in diagnoses of alcohol dependence, amphetamine dependence,

---

[9]  The GAF reflects "the clinician's judgment of the individual's overall level of functioning."  DSM-IV-TR at 32.  The GAF scale is divided into ten ranges of functioning, with each ten-point range having two components:  the first covering symptom severity and the second covering functioning.  Id.  A GAF score of 20-30 indicates behavior "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas."  Id. at 34.

[10]  A GAF of 35 indicates "[s]ome impairment in reality testing or communication," or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood[.]"  DSM-IV-TR at 34.  A GAF of 55 indicates "[m]oderate symptoms," or "moderate difficulty in social, occupational, or school functioning[.]"  Id.

in remission, and a mood disorder NOS.  Tr. 374.

In March 2005, plaintiff's medications were changed to discontinue trazadone, and to add doxepin[11] and lithium[12].  Tr. 369.  In June 2005, Seroquel[13] was added.  Tr. 367.  After experiencing increased anxiety symptoms, he started taking Vistaril[14] in early July 2005.  Tr. 366.  His diagnoses remained as a mood disorder NOS and PTSD.  Tr. 365-69.  In late July 2005, his Vistaril dose was increased.  Tr. 365.  In early September 2005, plaintiff's anxiety increased, and he received an increase of his Seroquel dose.  Tr. 362.  He also heard voices calling his name.  Id.          After his release from prison, plaintiff returned to Cascadia's walk-in clinic on October 24, 2005, reporting a need for emergency medication refills, until he could be enrolled at Westside Clinic.  Tr. 424.  He reported diagnoses of biploar disorder, PTSD, and polysubstance dependence in remission.  Id.  He reported his current medications as lithium, Prozac, and Seroquel.  Id.  He also reported occasional auditory hallucinations and some possible visual illusions.  Id.

A December 2005 chart note from Westside indicates that Dr. Lee Walters, M.D., noted plaintiff's current diagnoses as bipolar disorder and schizoaffective disorder.  Tr. 452.  A separate psychiatric evaluation was performed in January 2006 by Multnomah County

---

[11]  Doxepin is used to treat depression and anxiety.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000668/

[12]  Lithium is used to treat mania in people with bipolar disorder.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000531/

[13]  Seroquel is used to treat symptoms of schizophrenia or depression in patients with bipolar disorder.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/

[14]  Vistaril is used to treat anxiety.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000796/

psychiatrist N. Cloak, M.D.  Tr. 425-28.  Dr. Cloak's diagnoses were PTSD, polysubstance

dependence in sustained remission, and a dissociative disorder NOS.  Tr. 428.

Plaintiff continued to be a patient at Westside through the date of the ALJ hearing.  See

Tr. 449-51, 485, 491-509, 513-14, 522-29, 586-89, 592-93, 597-98  (records from Westside for

dates April-May 2006, April-June 2007, August - November 2006, January-October 2008).  His

diagnoses at Westside were schizoaffective disorder, bipolar type disorder, and PTSD.  Tr. 450

(April 2006); Tr. 490 (July 2008); Tr. 592-93, 597 (October 2008).

While he was a patient there, his symptoms included auditory hallucinations, visual

hallucinations, pacing, Tr. 450 (April 2006), depression with an increase in psychotic symptoms,

Tr. 529 (August 2006), lack of sleep, Tr. 521 (November 2006), Tr. 518  (December 2006), Tr.

516 (March 2007), auditory hallucinations with crowds, Tr. 518 (December 2006),  depression,

Tr. 509 (January 2008), racing thoughts, Tr. 507 (February 2008),  hallucinations reduced to

every couple of days, Tr. 492 (March 2008), memory impairment related to retaining

information he had read, Tr. 491 (June 2008), increased night waking, Tr. 485 (September 2008),

continued difficulty with concentration, including trouble following questions during his

interview with NP Marie at Westside, difficulty with the ability to function, Tr. 485 (September

2008),  flat affect and slowed speech, Tr. 485 (September 2008), increased visual hallucinations,

Tr. 589 (September 2008), paranoia, Tr. 589 (September 2008), poor sleep, Tr. 589 (September

2008), distressed affect and disheveled appearance, worsened mental status with increased

psychosis and worsened sleep, Tr. 589 (September 2008), continued sleep problems, not manic

or depressed, but irritable from lack of sleep, Tr. 586 (September 2008), anxious and distressed

affect, possibility of sleep apnea, Tr. 586 (September 2008), and sad and crying, Tr. 597

(October 2008).

His medications changed many times during his treatment at Westside, but included a

decrease in Seroquel and the addition of Abilify[15], Tr. 450 (April 2006), the addition of

Effexor[16], Tr. 527 (August 2006), the discontinuation of Prozac, Tr. 527 (August 2006), the

addition of trazadone and lorazepam, Tr. 518 (December 2006), the addition of Lamictil[17], Tr.

516 (March 2007), the discontinuation of trazadone, Tr. 516 (March 2007), the discontinuation

of Lamictil, Tr. 513 (June 2007), and the addition of Ambien[18], Tr. 586 (September 2008).

He also reported, at various times, improved stability and improved anxiety, Tr. 449

(May 2006), stability on his medications, Tr. 522 (October 2006), that the medications were

helping his bipolar symptoms, Tr. 514 (April 2007), improvement in mood, Tr. 497 (March

2008), and that his mood was pretty stable, Tr. 491 (June 2008),

During the time he was a patient at Westside, plaintiff went to the emergency room on

two different occasions for mental health crises. First, on a date most likely in May 2006[19],

------

[15] Abilify is used to treat symptoms of schizophrenia or mania or mixed symptoms of mania and depression in persons with bipolar disorder. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/

[16] Effexor is used to treat depression. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947/

[17] Lamictil is used to increase the time between episodes of depression, mania, or other abnormal moods in persons with bipolar disorder. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000957/

[18] Ambien is used to treat insomnia. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928/

[19] The record of this visit is undated. Tr. 481 (space for date left blank). But, the narrative notes that five days before this emergency room visit, plaintiff was restarted on Abilify and discontinued from Seroquel. Id. Records from Westside indicate that on May 1, 2006, plaintiff's Seroquel was decreased and he was started on Abilify, and that on May 15, 2006, his

plaintiff took himself to the emergency room due to increased depression and auditory hallucinations.  Tr. 481.  He was homeless and requested admission to the hospital for medication changes and stabilization.  Id.  There was no evidence of acute psychosis, and plaintiff denied having plans to hurt himself or others.  Id.  He was given Ativan[20] and a bus pass to access the Cascadia walk-in clinic.  Id.

In August 2006, plaintiff again presented to the emergency department with depression. Tr. 475.  He stated that for the previous month, he had thoughts of hurting himself or others, however he had no active suicide plan.  Id.  He continued to report auditory hallucinations.  Id. He was anxious.  Id.  He was given Ativan and instructed to follow up with Cascadia's walk-in clinic.  Id.  At the conclusion of his visit, he felt he was not an immediate danger to himself or others.  Id.

In October 2008, NP Marie wrote a letter describing plaintiff's mental health status.  Tr. 592-93.  She noted that she had been plaintiff's mental health provider for several years, seeing him on average once per month.  Tr. 592.  However, through early September 2008, he had been seen at Westside twenty-seven times, twenty-two times by NP Marie and five times by her colleague Anna Cox, another Psychiatric Mental Health Nurse Practitioner.  Id.  His diagnoses included schizoaffective disorder, bipolar type, and PTSD.  Id.

NP Marie described plaintiff's symptoms as including audio hallucinations, ongoing suicidal ideation over the past year, racing thoughts, poor sleep, hypomanic episodes, depressive

_____

dose of Seroquel was discontinued entirely.  Tr. 449.  Thus, it is likely that this hospital emergency room visit occurred in May 2006.

   [20]  Ativan is a brand name for lorazepam.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/

episodes, poor motivation, flat affect, poor eye contact, and sluggish movements.  Id.  He often

appeared to her as very sad.  Id.  When he is manic or hypomanic, he exhibits poor judgment,

lack of an ability to concentrate, and lack of an ability to track questions.  Id.

His treatment regimen at the time included lithium and the maximum allowable dose of

Abilify.  Id.  Nonetheless, NP Marie noted that his symptoms remained as described.  Id.  She

also noted that attempts at other medications had not proved useful over time.  Id.  She indicated

that he might suffer from sleep apnea, which compounded his insomnia, and he had been

referred to a specialist.  Id.  She indicated that because of his lack of health insurance and lack of

income, his treatment options were limited.  Id.

NP Marie also stated that plaintiff was compliant with this treatment, keeping eighty-one

percent of his appointments at Westside in the past year, which NP Marie opined was excellent

given the nature and severity of his mental health impairments.  Id.

Despite his treatment compliance, NP Marie explained that plaintiff's symptoms

remained severe.  Id.  She assessed him as having marked limitation in his activities of daily

living, exemplified by the fact that he sleeps in a heavy-duty sleeping bag and cannot muster the

faculties to cook for himself.  Id.  She assessed him as markedly impaired in his social

functioning, exemplified by the fact that he avoids social interactions because he is fearful and

paranoid, has difficulty finding words, and does not communicate well with others.  Id.  She

assessed him as being markedly impaired in his concentration, persistence, and pace, because he

is distracted by hallucinations, fears, and paranoia, he cannot remember what he has read even

when his mood is reasonably stable, and he sometimes cannot stay on task enough to get him to a

clinic appointment.  Tr. 592-93.  She explained that he has suffered multiple decompensations

resulting from his mood instability, during which he stops taking his medications, becomes suicidal, and fails to keep his clinic appointments.  Id.

NP Marie stated that plaintiff's mental health impairments had been severe for several years despite treatment.  Tr. 593.  His symptoms and limitations are such that even a minimal increase in demands or change in his environment would cause him to decompensate.  Id. Finally, she noted that during her treatment of plaintiff, she had seen no indications of drug or alcohol abuse and no reason to believe he was malingering or exaggerating his symptoms.  Id. On the contrary, she explained, his "presentation over time has been consistent with someone who is suffering from chronic, severe mental health issues."  Id.  She concluded by noting that the information provided in the letter was based on her professional knowledge, her clinical observations of plaintiff, and her long-term treatment relationship.  Id.

At the request of Kelly Goodman, a licensed clinical social worker with Westside, plaintiff had a psychiatric evaluation performed by Dr. Eugene Taylor, M.D., on October 20, 2008.  Tr. 594-96.  At the hearing with the ALJ, plaintiff's counsel explained that Dr. Taylor was not an employee of Westside, but volunteered his services for the clinic.  Tr. 27-28. Dr. Taylor, a non-examining psychiatrist, based his assessment on the medical records from Westside.  Tr. 20.

In his mental RFC, Dr. Taylor assessed plaintiff with the following marked limitations: the ability to remember locations and work-like procedures, the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, the ability to work in coordination with or proximity to others without being unduly

24 - OPINION & ORDER

distracted by them, the ability to make simple, work-related decisions, the ability to complete a

normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods, the

ability to interact appropriately with the general public, the ability to accept instructions and to

respond appropriately to criticism from supervisors, the ability to get along with co-workers or

peers without unduly distracting them or exhibiting behavioral extremes, and the ability to

respond appropriately to changes in the work setting.  Id.  He opined that the assessed limitations

have lasted twelve continuous months, or could be expected to last twelve continuous months at

the assessed level of severity, and that the onset of these limitations was the year 2000.  Id.

Following the first hearing, plaintiff was examined, at the ALJ's request, by Dr. Sacks on

December 3, 2008.  Tr. 599-605.  Dr. Sacks interviewed plaintiff, reviewed his social security

"hearings file," performed a mental status examination of plaintiff, and administered the MMPI-

II test.  Tr. 599.   Dr. Sacks's diagnostic impressions were polysubstance abuse in reported

remission, rule-out substance induced psychosis, and rule-out schizoaffective disorder.  Tr. 605.

He rated plaintiff's GAF as 52.  Id.  He assessed plaintiff as having marked limitations in his

ability to understand and remember complex instructions, his ability to carry out complex

instructions, his ability to make judgments on complex work-related decisions, his ability to

interact appropriately with the public, and his ability to respond appropriately to usual work

situations and to changes in a routine work setting.  Tr. 602-03.  But, Dr. Sacks explained,

plaintiff's report concerning his substance abuse was "inconsistent across examiners" and thus, it

was assumed that his substance abuse played a role in the assessments of plaintiff's limitations.

Tr. 603.  Dr. Sacks indicated that if plaintiff were sober, he would have only mild restrictions.

Id.

Finally, as for the test results, Dr. Sacks noted that plaintiff's responses to the MMPI-II resulted in a "highly and globally elevated profile" with "[s]everal measures of response validity indicat[ing] extreme over-reporting and exaggeration of symptomatology. Tr. 605. He further noted that while plaintiff may be experiencing significant distress, the profile was "clinically uninterruptable"[21] because of the response style. Id. He indicated that plaintiff's "motivation for responding in this manner may be hypothesized as an effort to emphasize distress." Id.

B. ALJ Decision

The ALJ concluded that plaintiff had mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no extended episodes of decompensation. Tr. 16. The ALJ found that plaintiff's treatment for his impairments has been "essentially routine and/or conservative in nature" and had been "generally successful in controlling those symptoms" and thus, while the receipt of treatment for disability symptoms would normally weigh somewhat in his favor, in plaintiff's case it did not. Tr. 18. The ALJ further found that plaintiff's treatment showed long periods of time during which he did not specify any particular complaint and had relatively infrequent trips to the doctor. Id. The ALJ found this inconsistent with plaintiff's claim of ongoing, disabling symptoms. Id. The ALJ cited to the various GAF assessments in the record, from June 2001 to January 2006, and ranging from 35 to 55[22], which the ALJ said represented a "low moderate" impairment in social and occupational functioning. Tr. 19.

---

[21] I assume "uninterruptable" should read "uninterpretable."

[22] The ALJ neglected to note the GAF assessment of 20-30 on July 3, 2003. Tr. 334.

The ALJ rejected NP Marie's opinion because she is not an acceptable medical source, her conclusions were not well supported by medically acceptable clinical and/or laboratory diagnostic studies, and her own clinical notes failed to reflect the level of impairment she attributed to plaintiff.  Id.  Additionally, she relied "quite heavily" on plaintiff's subjective report of symptoms which, the ALJ explained, was not reliable.  Id.

The ALJ then determined that NP Marie became an advocate for plaintiff.  Id.  The ALJ explained:

> The wide discrepancy between her clinical observations and her stated opinion suggests that Ms. Marie has inadvertently stepped out of her role as an objective treating medical source and has assumed the role of advocate.  The possibility always exists that a medical provider may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their treating medical sources, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.  For these reasons, I conclude Ms. Marie's opinions cannot be afforded significant weight.

Tr. 19-20.

The ALJ rejected the assessment by volunteer psychiatrist Dr. Taylor because he neither treated nor directly examined plaintiff, and he relied on NP Marie's clinical notes.  Tr. 20.  The ALJ then summarized Dr. Sacks's report, indicating that Dr. Sacks found plaintiff's multiple reports to different sources concerning his substance abuse contradictory and believed the abuse negatively affected plaintiff's functioning such that if plaintiff were sober, he would experience only mild functional limitations.  Id.

Finally, the ALJ noted that a non-examining psychological consultant assessed plaintiff

in February 2006 as experiencing moderate restrictions in his activities of daily living, moderate

restrictions in maintaining social functioning, mild difficulties in maintaining concentration,

persistence, and pace, and experiencing no extended episodes of decompensation.  Id.

According to this consultant, plaintiff should be limited to only occasional contact with the

public.  Id.  The ALJ stated that a second state agency non-examining psychologist affirmed the

first psychologist's assessment in July 2006.  Id.

C.  Discussion

Plaintiff argues that the ALJ erred in rejecting NP Marie's opinion.  Plaintiff contends

that contrary to the ALJ's findings, NP Marie's conclusions are supported by medically

acceptable clinical studies and her own clinic notes.  Plaintiff argues that the treatment history

from Westside, over the course of several years, including NP Marie's own clinical notes, reveals

plaintiff's assessment of bipolar disorder, schizoaffective disorder, auditory hallucinations,

memory impairment, concentration difficulties, and depression.  Additionally, Dr. Taylor's

assessment, based on the Westside reports, showed marked limitations in several abilities.

In response, defendant primarily repeats the arguments articulated by the ALJ in support

of rejecting NP Marie's opinion.  Additionally, defendant argues that because NP Marie is an

"other source," not an "acceptable medical source," her diagnoses may not establish a medically

determinable impairment, and her opinion may be rejected for reasons germane to the witness.

Under social security regulations governing the weight to be accorded to medical

opinions, "acceptable medical sources" include licensed physicians and licensed psychologists,

but not nurse practitioners.  20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a), (d)(1).  Nurse

practitioners are deemed to be "other sources."  Id.  Under Ninth Circuit law, evidence from

"other sources" is considered  under the same standard as that used to evaluate lay witness testimony, meaning the ALJ may reject it for reasons germane to the witness.  See, e.g., Bruce v. Astrue, 557 F.3d 1113, 1115-16 (9th Cir. 2009) (explaining standard for lay witness testimony).

However, if the record shows that the nurse practitioner worked closely under the supervision of an acceptable medical source treating physician, the nurse practitioner's opinion may be treated as part of the treating physician's opinion.  Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996).  The nurse practitioner is considered  the "agent" of the acceptable medical source.  Id.

In Social Security Ruling (SSR) 06-03p, issued on August 9, 2006 (available at 2006 WL 2329939), the Social Security Administration (SSA) recognized that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists."  Id. at *3.  The SSA recognized that "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  Id.

Medical sources who are not "acceptable medical sources" may not establish the existence of a medically determinable impairment, but, "information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Id. at *2.  Factors for

consideration of such other medical sources include:  (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  Id. at *4-5.  Generally, the adjudicator "should explain the weight given to opinions from these 'other sources[.]'"  Id. at *6.

Plaintiff contends that because NP Marie is a Psychiatric Mental Health Nurse Practitioner, which required her to obtain a nursing degree, a nurse practitioner degree, and an accreditation in mental health with prescribing privileges, the ALJ was required to articulate reasons more than those "germane" to NP Marie's testimony in support of the ALJ's rejection of NP Marie's opinion.  Plaintiff contends that the rejection of an "other medical source" requires a review of the same criteria as the rejection of an acceptable medical source.

As I understand the SSR, an ALJ is advised to apply the factors listed above in considering evidence from an other medical source.   However, as noted in SSR 06-03p, the regulations in the relevant CFR sections which enumerate these factors, explicitly apply only to the evaluation of medical opinions from acceptable medical sources.  Id. at *4 (citing 20 C.F.R. §§ 505.1527(d), 416.927(d)).  Thus, while the SSA states in SSR 06-03p that these factors "represent basic principles that apply to the consideration of all opinions from [other medical sources]," it does not mandate their application to other medical sources.  Id. (stating that these factors "can" apply to opinion evidence from other medical sources).  Although SSR 06-03p discusses the importance of other sources' testimony in establishing disability, nowhere does it

purport to overrule the regulations' classification of nurse practitioners as "other sources."

Here, the ALJ recognized that NP Marie was not an acceptable medical source, but he also stated that her opinion was important and relevant to issues such as the severity of plaintiff's impairment and the effects on his ability to work.  Tr. 19.  The ALJ then proceeded to discuss his reasons for rejecting NP Marie's opinion.  Tr. 19-20.

I agree with defendant that under the regulations for "other sources," the ALJ applied the appropriate analysis.  However, I agree with plaintiff that the ALJ's rejection of NP Marie's opinion is not based on substantial evidence in the record.  While the ALJ may have considered relevant factors, the ALJ erred nonetheless.

First, the ALJ found that NP Marie's opinion was not well supported by clinical or laboratory studies and that her clinical notes failed to reflect the level of impairment she assessed for plaintiff.  But, with diagnoses of PTSD, depression, as well as schizoaffective disorder and bipolar disorder, it is unclear what clinical or laboratory studies were available to plaintiff, especially considering that he has no health insurance making his treatment options limited. The ALJ fails to explain the basis for his statement.

Second, the ALJ found that NP Marie's opinion was not supported by her clinical notes. But, as detailed above, the medical records from Westside show that plaintiff suffered from a variety of impairing symptoms, including, but not limited to:  auditory hallucinations, depression, racing thoughts, memory impairment, difficulty concentrating, sleep problems, anxiety, and a distressed and flat affect.  He also went to the emergency room on two occasions while he was a patient at Westside because he was depressed or  suicidal.  Additionally, during this time, plaintiff was frequently homeless, sometimes living in a motel, Tr. 526, the Salvation

Army's Harbor Light Center, Tr. 525, or in a shed on his mother's property.  Tr. 491, 492, 509.

While plaintiff had some periods of improvement, such symptom free periods are not inconsistent with disability, especially considering his repeated changes of medication and the nature of mental illness.  See Lester, 81 F.3d at 833 ("Occasional symptom-free periods . . . are not inconsistent with disability").   Moreover, the record demonstrates that plaintiff went through cycles of complying with his medications, becoming stable with improving symptoms, then believing that he no longer needed his medications which led to episodes of increased symptoms. Tr. 35, 319.

NP Marie also gave specific examples of the symptoms she found which supported her assessment of marked limitations in several areas.  For example, she noted that he was markedly impaired in his concentration, persistence, and pace, because he is distracted by hallucinations, fears, and paranoia, he cannot remember what he has read even when his mood is reasonably stable, and he sometimes cannot stay on task enough to get him to a clinic appointment.  Tr. 592-93.  These symptoms are supported by her clinical notes.  E.g., Tr. 450, 485, 491, 518, 589.

Contrary to the ALJ's finding, NP Marie's clinical notes support her opinion.  The ALJ erred in concluding otherwise.

Third, the ALJ rejected NP Marie's opinion because it was largely based on plaintiff's subjective testimony, which the ALJ found not credible.  Again, I conclude that the ALJ erred. NP Marie had a long treating relationship with plaintiff.  Her notes reflect her direct observations of plaintiff's symptoms including his flat affect, slowed speech, distressed affect, anxious affect, sadness, disheveled appearance, and problems with concentration as demonstrated by difficulty in tracking questions posed to him during a clinical visit.  Because these are symptoms NP Marie

observed herself, it is inaccurate to suggest that her opinions were based on plaintiff's subjective allegation of symptoms.  Additionally, as explained above, the ALJ erred in rejecting plaintiff's subjective testimony and thus, it was inappropriate for the ALJ to rely on the lack of credibility of that testimony in support of his rejection of NP Marie's opinion.

Finally, the ALJ has no affirmative evidence of NP Marie "stepping out of her role" as an objective treating medical source and assuming an inappropriate role as an advocate.  The ALJ cites the alleged inconsistency between NP Marie's clinical observations and her opinion as the basis for his finding that her opinion is tainted by her sympathy.  As indicated above, her opinion is supported by her clinical observations.  Moreover, the record fails to show that NP Marie has any objective other than providing care for her patient.   The case defendant cites in support of the proposition that an ALJ may consider a close relationship between a lay witness and a claimant in evaluating the witness's testimony, is distinguishable because there, the lay witness was the claimant's girlfriend who had an obvious desire to help the claimant obtain benefits. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).  Here, a medical provider with a long-standing treating relationship with a claimant has done nothing more than write a detailed letter assessing the severity of plaintiff's impairments.  Finally, the Westside records show no badgering or insistent demands by plaintiff that NP Marie write him a letter of support.  The record does not support the ALJ's conclusion that NP Marie was influenced by inappropriate motives or sympathy.

In sum, while the ALJ articulated the correct legal standard for evaluating a nurse practitioner's testimony, his findings are inconsistent with substantial evidence in the record and thus, his rejection of NP Marie's opinion as expressed in her October 2008 letter, was error.

33 - OPINION & ORDER

III.  Lay Witness Testimony

Plaintiff's mother Carolyn Nunn submitted a written Third Party Function Report, dated January 4, 2006.  Tr. 151-58.  She stated that she sees plaintiff thirty to fifty hours each week because although he lived in transitional housing at that time, he came to her house for company, to watch television, and to do laundry.  Tr. 151.  While at her house, he used the computer and ate food.  Id.  Plaintiff's mother took him grocery shopping.  Id.

Nunn explained that plaintiff used to be able to be around people without getting agitated, but that was no longer the case.  Tr. 152.  She stated that he could no longer be in a room with loud noises, could no longer concentrate, and could no longer "hold a thought."  Id.  And, while he no longer cared if he clothes matched or got dirty, he was overly concerned with brushing his teeth, which he did approximately three to four times during his four to five hour visits.  Id.

According to Nunn, plaintiff needed to be reminded to make and keep doctor and other appointments, and to refill his medications.  Tr. 153.  He was able to microwave meals and prepare a sandwich and snacks.  Id.  He could walk and use public transportation.  Id.  He shopped for groceries with her.  Tr. 151, 154.  As for his social activities, Nunn described that plaintiff talked on the phone to a friend who called from Kansas, or came to her house to watch television or use the computer.  Tr. 155.  Other than that, he went nowhere.  Id.  She described him as not interacting well with others when at her house.  Id.

Nunn described plaintiff as having a short fuse, especially when unmedicated, and stated that he did not interact with others for more than one to two minutes at a time.  Tr. 156.  He used to be "really sharp," but now he cannot remember what he is doing and cannot fill out

paperwork.  Id.  He gets angry when he has to ask for help.  Id.  He can pay attention for only "a nano second" and does not do well following instructions.  Id.  For example, if he is asked to do two things, at least one of them will need to be repeated.  Id.  Nunn stated that plaintiff could not handle stress at al.  Tr. 157.  Finally, she indicated that plaintiff thinks people spy on him and follow him, and he hears people talking.  Id.

The ALJ failed to mention Nunn's written statements.  Defendant acknowledges that the ALJ did not specifically address Nunn's written testimony, but defendant argues that the ALJ considered it nonetheless and that any error committed by the ALJ was harmless.

Defendant argues that while the ALJ did not precisely link a germane reason to an express determination regarding Nunn's statements, substantial evidence supports the ALJ's decision because the appropriate inferences, logically flowing from the evidence, may be drawn by the court.  I disagree.  In Stout v. Commissioner, 454 F.3d 1050 (9th Cir. 2006), the court explained that "[i]n determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work" Id. at 1053 (emphasis added). Moreover, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence and therefore cannot be disregarded without comment." Id. (internal quotation and ellipsis omitted) .  The ALJ erred by failing to discuss Nunn's testimony. Additionally, the error is not harmless because the limitations Dunn observed go beyond the limitations the ALJ accounted for in his RFC.

## IV.  Substance Abuse

The record contains various references to plaintiff's substance abuse over the years.  E.g., Tr. 324-26 (June 1999 emergency room report noting injury sustained in fight after significant

alcohol use, noting plaintiff is "evidently in the habit of drinking alcohol," noting plaintiff denied

using street drugs but had a positive test for THC ); Tr. 295-96 (June 12, 2001 assessment by

Cascadia in which plaintiff reported a history of methamphetamines seven to eight years before,

and current twice per month marijuana use for relaxation and pain management); Tr. 301

(December 17, 2001 assessment by Cascadia in which plaintiff reported drinking approximately

one six-pack per week, and daily use of marijuana with his wife to reduce his anxiety); Tr. 293

(January 15, 2003 note of visit to Cascadia walk-in clinic with plaintiff reporting intermittent

drinking binges, last time being New Year's Eve 2002, and last time being drunk over two years

earlier); Tr. 380 (in November 2004 assessment upon entry to ODOC custody, plaintiff

recounted substance abuse history as including methamphetamine use from ages thirteen to

twenty-three, with a relapse "up to arrest", daily alcohol use after he quit methamphetamines,

some use of marijuana before his arrest, experimentation with hallucinogens in high school, and

noting his drug of choice was alcohol); Tr. 449 (May 15, 2006 chart note from Westside

indicating plaintiff had a single episode of methamphetamine relapse which embarrassed him).

The ALJ concluded that while plaintiff had been diagnosed with a medically

determinable substance abuse disorder, the record established that after factoring out the

substance abuse, plaintiff was capable of performing the "basic demands of competitive,

remunerative, unskilled work on a sustained basis[,]" and therefore, plaintiff's substance abuse

was not a "contributing factor material to the disposition of this case."  Tr.21.

The ALJ also accepted Dr. Sacks's assessments of plaintiff's limitations as mild when

plaintiff is sober, and marked only when plaintiff's polysubstance abuse was considered.  Tr. 20.

Plaintiff argues that the ALJ improperly assessed the existence and effects of substance

abuse because the record is devoid of affirmative evidence of ongoing substance abuse.  Plaintiff

notes that the ALJ cites only the single record created by Dr. Sacks regarding the existence of

plaintiff's substance abuse and its effects on plaintiff's impairments.

Plaintiff does not dispute that at step two, the ALJ found one of plaintiff's severe

impairments to be polysubstance dependence in claimed remission. Tr. 15.  The proper drug and

alcohol analysis (DAA) by the ALJ in a case where the claimant has alcohol or drug addiction

issues, is to first conduct the five-step sequential evaluation "without separating out the impact of

alcoholism or drug addiction."  Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001).  If

the ALJ determines that the claimant is not disabled, the claimant is not entitled to benefits and

no further analysis is necessary.  Id.  If, considering the impact of the relevant addiction, the ALJ

determines that the claimant is disabled, and there is medical evidence of drug or alcohol

addiction, then the ALJ should proceed under 20 C.F.R. §§ 404.1535 or 416.935, to determine if

the claimant "would still be found disabled if he or she stopped using alcohol or drugs."  Id.

(internal quotation and brackets omitted).

Here, it is unclear why the ALJ considered plaintiff's substance abuse under the DAA

regulations because it appears from reading the ALJ's decision that in conducting the five-step

sequential analysis without separating out the impact of substance addiction, the ALJ concluded

that plaintiff was not disabled.  Thus, no further analysis was necessary.  Yet, the ALJ proceeded

to conclude that when plaintiff's substance abuse was "factored out," he was capable of

performing the basic demands of work on a sustained basis.  This conclusion appears to be

unwarranted given that the ALJ found plaintiff not disabled without previously separating out

the impact of any drug or alcohol issues.

37 - OPINION & ORDER

Perhaps the reason the ALJ engaged in the DAA analysis was because of the comments and assessments made by Dr. Sacks. Dr. Sacks remarked that plaintiff's report to him on December 3, 2008 that he last used methamphetamine one and one-half years ago was inconsistent with reports in other records that he last used the drug when he was twenty-three years old. Tr. 605. Dr. Sacks failed to identify which other reports he referred to, and in my review of the record, it appears that plaintiff fairly consistently reported that his methamphetamine use was regular from the ages of approximately thirteen to twenty-three, Tr.295-96, 380, and that he further acknowledged his single post-prison relapse in May 2006 in his hearing before the ALJ. While plaintiff's report to Dr. Sacks that his last use of methamphetamine was one and one-half years before his December 2008 interview date puts that use to a time in May 2007, given that there is no evidence in the record of any substance abuse following plaintiff's release from prison in the fall of 2005 except for the May 2006 episode, it was error for Dr. Sacks to assume that plaintiff's reference was to anything but that May 2006 episode. Without any reference by Dr. Sacks to the actual records he was relying on, his finding regarding plaintiff's alleged inconsistent substance abuse reporting is unsupportable as I read the record.

As to Dr. Sacks's limitations assessments, the record simply does not support a finding of active substance abuse in December 2008 when Dr. Sacks interviewed plaintiff and rendered his opinion on plaintiff's abilities. While the record is capable of suggesting that plaintiff's substance abuse may have been active before his fall 2004 admission to ODOC, there is no evidence in the record suggesting, but for a single relapse episode of methamphetamine use, that plaintiff has sustained any drug abuse following his fall 2005 release from prison. There is also

38 - OPINION & ORDER

no evidence in the record suggesting that since his release from ODOC in the fall of 2005, he drinks alcohol more than occasionally, or that when he does, he drinks to excess. Thus, Dr. Sacks's limitations assessments are unreliable because they are based on an assumption that plaintiff's substance abuse was ongoing at the time of his report in December 2008, and that assumption is not supported by substantial evidence. As a result, Dr. Sacks's assessments and opinion cannot provide a supportable basis for the ALJ's opinion.

V.  Steps Four and Five

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence in the record and as a result, the ALJ's findings at steps four and five are not supported. For the reasons discussed above, I agree with plaintiff that the ALJ erroneously disregarded evidence from NP Marie, from plaintiff, and plaintiff's mother regarding plaintiff's limitations, and further erroneously relied on assessments by Dr. Sacks which were not supported in the record. Accordingly, the ALJ's RFC failed to account for all of plaintiff's limitations and thus, cannot support his step four finding and cannot provide a basis for valid VE testimony. See Valentine, 574 F.3d at 690 (hypothetical presented to the VE is derived from the RFC; to be valid, the hypothetical presented to the VE must incorporate all of a plaintiff's limitations); Nguyen, 100 F.3d at 1466 n.3 (an incomplete hypothetical cannot "constitute competent evidence to support a finding that claimant could do the jobs set forth by the vocational expert"). As a result of the errors in rejecting evidence, the ALJ's step four and step five findings are not supported by substantial evidence in the record.

VI.  Remand for Benefits

After determining that the ALJ erred in rejecting NP Marie's opinion, plaintiff's

testimony, and lay witness testimony, I must determine the proper remedy.   In Varney v. Secretary, 859 F.2d 1396 (9th Cir.1988) (Varney II), the Ninth Circuit adopted the "credit-as-true" rule, holding that the Commissioner must accept a claimant's subjective testimony if the ALJ fails to articulate sufficient reasons for refusing to credit it.  Id. at 1398-99, 1401; see also Vasquez, 572 F.3d at 593 (explaining holding in Varney II).

The Varney II holding, however, was limited to cases "where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited[.]" Varney II, 859 F.2d at 1401; Vasquez, 572 F.3d at 593.  Since Varney II, there has been a split of authority in the Ninth Circuit concerning whether the credit-as-true rule is mandatory or discretionary under the circumstances described by Varney II. Vasquez, 572 F.3d at 593 (comparing Lester, 81 F.3d at 834, where claimant's testimony must be credited as true, with Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003), where the court had flexibility in applying the credit-as-true rule).

Ninth Circuit decisions after Connett suggest that the application of the credit-as-true rule is encouraged, if not altogether mandatory. See Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) ("the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.").  The court also expanded the scope of the credit-as-true rule, crediting both the improperly rejected

treating physician's opinion and the claimant's subjective testimony.  Id. at 593-94.

I apply the credit-as-true rule because even if the rule is completely discretionary, I would exercise my discretion to apply the rule in this case because the ALJ failed to provide legally sufficient reasons for rejecting the evidence, as explained below there are no outstanding issues that must be resolved before a determination of disability may be made, and it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

In this case, the VE, upon questioning by plaintiff's attorney, testified that a person with no exertional impairments, but with a marked limitation in concentration, persistence, and pace, would not be able to sustain competitive employment.  Tr. 54.  Additionally, a person who was preoccupied by paranoia and had an inability to stay on task such that he would miss more than two days per month of work because of his impairments, would also not be able to sustain competitive employment.  Id.

Given this testimony, the record establishes that when NP Marie's opinion and limitations assessments are credited, along with the statements submitted by plaintiff's mother and plaintiff's testimony, plaintiff's limitations would preclude him from sustaining competitive employment, making him disabled for purposes of DIB and SSI.  Thus, there are no outstanding issues that need to be resolved and the ALJ would be required to find plaintiff disabled when the improperly rejected evidence is credited.  In this case, remanding for an award of benefits is appropriate.

/ / /

/ / /

/ / /

41 - OPINION & ORDER

CONCLUSION

The Commissioner's decision is reversed and remanded for a determination of benefits.

IT IS SO ORDERED.

Dated this __1st_____ day of __April_____, 2011

 

 

 

 /s/ Marco A. Hernandez_____
Marco A. Hernandez
United States District Judge